IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>MEHDI NIKPARVAR-FARD,<br>a/k/a MEHDI ARMANI | :<br>:<br>:<br>:<br>:<br>: | CRIMINAL ACTION NO. 17-513<br><br><br><br><br>CIVIL ACTION NO. 23-1550 |

**MEMORANDUM**

**Padova, J.** **April 18, 2024**

Before the Court is Defendant's *pro se* Amended Motion to Vacate, Set Aside, or Correct Sentence pursuant to 28 U.S.C. § 2255. Defendant asks that we vacate his conviction and sentence in this case because the Government violated his rights under the Due Process Clause as set out in Brady v. Maryland, 373 U.S. 83 (1963), by failing to provide him with certain exculpatory and impeachment evidence prior to trial. For the following reasons, we deny the § 2255 Motion.

## I. BACKGROUND

On January 17, 2018, Defendant was convicted by a jury of retaliating against a federal official by threatening in violation of 18 U.S.C. § 115 (Count One) and making false statements in violation of 18 U.S.C. § 1001 (Count Two). He was sentenced on March 23, 2018 to 18 months of imprisonment on both counts, to be served concurrently, three years of supervised release, a $45,000 fine, and a $200 special assessment. He appealed his conviction to the United States Court of Appeals for the Third Circuit, which affirmed. See United States v. Nikparvar-Fard, 782 F. App'x 160 (3d Cir. 2019).

The charges against Defendant arose from his interaction with three Deputy United States Marshals on August 29, 2017. At that time, Defendant was a respondent to a Petition to Enforce

Administrative Subpoena brought by the United States Department of Labor against Defendant and Advanced Urgent Care of City Line, LLC, which was assigned to the Honorable Cynthia M. Rufe. See Hugler v. Advanced Urgent Care of City Line LLC, Misc. A. No.17-11 (E.D. Pa.). On August 11, 2017, Judge Rufe held a hearing on a motion for adjudication of civil contempt that was filed by the Department of Labor after Defendant failed to comply with three previous court orders, which required him to produce certain documents subpoenaed by the Department of Labor. See id. (Docket Nos. 6, 12, 16, 21.) Defendant failed to appear at the August 11, 2017 hearing and was held in civil contempt for failing to comply with the three previous court orders. See id. (Docket No. 21 ¶ 1). Judge Rufe's August 11, 2017 contempt order stated that a bench warrant would be issued for Defendant's arrest unless he produced the subpoenaed documents in accordance with the three previous court orders by August 25, 2017. See id. (Docket No. 21 ¶ 3). Defendant failed to produce the subpoenaed documents by August 25, 2017. See id. (Docket No. 25). On August 28, 2017, Judge Rufe ordered the Clerk of Court to issue a bench warrant for his arrest. See id.

On August 29, 2017, Deputy United States Marshals Johannes Jarkowsky, Thomas Gabriel, and John Grandison were assigned to execute the civil contempt warrant for Defendant's arrest. (1/9/18 N.T. (Gov't Answer Attach. 2) at 61, 64-68.) One of the addresses for Defendant that was given to the Deputies was the address of Advanced Urgent Care on City Line Avenue in Philadelphia. (Id. at 69.) The Deputies were also given a couple of pictures of Defendant. (Id. at 68.) The Deputies drove to the Advanced Urgent Care in an unmarked Ford Explorer. (Id. at 69, 84.) They parked in front of the Advanced Urgent Care, which had a front door and a side door at the back of the building. (Id. at 70.) Deputy Marshal Jarkowsky initially

waited outside of the side door, while Deputy Marshals Gabriel and Grandison went in the front door. (Id.)

When they entered the Advanced Urgent Care, Deputy Marshals Gabriel and Grandison walked up to the reception counter and asked if Defendant was in the office. (Id. at 145.) A receptionist told them that Defendant was in the office and the Deputies showed her their Government-issued badges, identified themselves, and said that they needed to speak with Defendant. (Id. at 146.) The receptionist told the Deputies that she would go get Defendant and walked towards a door behind the reception desk. (Id.) The Deputies followed her through the door. (Id.) They encountered Defendant as soon as they passed through the door into the patient area. (Id. at 147.) They asked Defendant if they could talk to him in a private office. (Id.) Once they were in the private office, the Deputies told Defendant that they had a warrant for his arrest. (Id.) Defendant countered that the Deputies had no right to be in his business and called the Deputies "assholes." (Id. at 147-48.) Defendant also pointed at the warrant and said "'That's not me. Get the fuck out of here.'" (Id. at 148; see also 1/10/18 N.T. (Gov't Answer Attach. 2) at 29.) In response, Deputy Marshal Grandison asked Defendant for identification. (1/9/18 N.T. at 148.) Defendant pulled a three-inch-thick wad of identification and business cards out of his pocket. (Id. at 149.) Deputy Marshal Grandison watched the Defendant "thumb past the driver's license and other different forms of identification until he [got] to a Pennsylvania State ID, and a passport card with the name Mehdi Armani on it." (Id. at 149-150.) Defendant handed both of those cards to Deputy Marshal Grandison and said "'See, it's not me. Get the fuck out of here.'" (Id. at 150.) The driver's licenses that Defendant pulled out of his pocket, an expired Pennsylvania driver's license and a current Pennsylvania driver's license, were both issued in the name Mehdi Nikparvar-Fard. (Id. at 153-54.) The driver's licenses and the Pennsylvania State

ID all contained a picture of Defendant. (Id. at 113.) All three of these identification cards also contained the home address given for Defendant on the warrant. (Id. at 151-53.)

Deputy Marshal Grandison told Defendant that the Deputies were arresting him even though he denied being Mehdi Nikparvar-Fard. (Id. at 156.) Deputy Marshal Grandison then called Deputy Marshal Jarkowsky and told him that he could come inside. (Id.) Deputy Marshal Jarkowsky entered the Advanced Urgent Care office through the front door and joined the other two Deputies and Defendant. (Id. at 71, 73.) Deputy Marshal Jarkowsky heard Defendant tell the other two Deputies "'that's not me.'" (Id. at 74-75.) Deputy Marshal Gabriel subsequently handcuffed Defendant. (Id. at 77.) Defendant was not happy about being placed in handcuffs and resisted the Deputies by cursing at them, yelling at them, and jerking his shoulders back and forth. (1/10/18 N.T. at 30.) The Deputies then took Defendant out of the Advanced Urgent Care office through the front entrance. (1/9/18 N.T. at 79, 83.) Defendant was very angry that the Deputies escorted him through the front of the office where his patients could see him. (Id. at 83-84)

The Deputies put Defendant in the back seat of the Ford Explorer with Deputy Marshal Jarkowsky. (Id. at 84.) Deputy Marshal Grandison, who is African American, drove the vehicle and Deputy Marshal Gabriel sat in the front passenger seat. (Id. at 84-86.) The Defendant began insulting the Deputies, calling Deputy Marshal Grandison "the N-word," calling Deputy Marshal Jarkowsky a "faggot," and using "a litany of . . . curses." (Id. at 86.) Defendant's verbal abuse of the Deputies lasted the entire 25-minute drive from the medical office to the Courthouse. (Id.) Because the Defendant's conduct was out of the ordinary for a defendant being driven to court, Deputy Marshal Jarkowsky decided to record Defendant on his iPhone. (Id. at 87.) He started the recording about five minutes into the drive to the Courthouse. (Id. at 88.) Approximately

five minutes after Deputy Marshal Jarkowsky began to record Defendant, Defendant began to threaten him with physical violence. (Id.) The portion of the recording in which Defendant uttered the threatening language was played for the jury during Defendant's trial in this case and a transcript of the recording was entered into evidence as Government Exhibit 4. (Id. at 95-104; Gov't Ex. 4 (Gov't Answer Attach. 1).) The transcript includes the following:

> [Defendant]: Son of a bitch. Asshole, I do not remember your face, your face will be with me all the time, ok, we will see each other, don't worry about that, we will see each other.
>
> [Deputy Marshal Jarkowsky]: Is that a threat.
>
> [Defendant]: We will see each other.
>
> [Deputy Marshal Jarkowsky]: Ok
>
> [Defendant]: You asking me a question, do you have the authority to ask me a question?
>
> [Deputy Marshal Jarkowsky]: I asked if that was a threat.
>
> [Defendant]: No, don't Fuck, do you have authority to ask a question
>
> [Deputy Marshal Jarkowsky]: We were having a conversation
>
> [Defendant]: What were you told. No you don't have a conversation with me. You can't have a conversation with me, you cant [sic] have a conversation with me asshole, they didn't teach you this stuff.
>
> [Deputy Marshal Jarkowsky]: Ok
>
> [Defendant]: Is it a threat, why should I threat you, you make $40,000 you are poor asshole who is struggling to pay his rent and at the end of the month that's all you do, you lucky to have a job as a marshal, who do you think you are for somebody at my scale to come and threaten you. Is that what you think, if I want to do that, I pay a ni---er like this guy five grand to put a fucking bullet in your head if I wanta [sic] do that, I won't come in front of you, somebody with two million dollar income, come threaten you, a ni---er, an ass, ah, two faggot, you think you really at my level, do you think that, do you think that you're at my level, in any aspect of . . . this society, do you think I will have the same retirement as you do?

(Gov't Ex. 4 at 2-3.)

Count One of the Indictment charged Defendant with "threaten[ing] to assault and murder a federal law enforcement officer," namely Deputy Marshal Jarkowsky, while the officer "was engaged in the performance of his official duties and with intent to retaliate against [Deputy Marshal Jarkowsky] on account of the performance of his official duties," in violation of 18 U.S.C. § 115(a)(1)(B). (Docket No. 20 at 1.) Count Two of the Indictment charged Defendant with "knowingly and willfully [making] materially false, fictious, and fraudulent statements and representations when he was confronted with a bench warrant for the arrest of MEHDI NIKPARVAR and stated, 'That's not me,'" in violation of 18 U.S.C. § 1001. (Id. at 2.)

Defendant argues that his conviction of Counts One and Two should be vacated because the Government failed to provide him the statement of an FBI agent, which he received in discovery from the Government in connection with a criminal case, United States v. Nikparvar-Fard, et al., Crim. A. No. 18-101 (E.D. Pa.). Defendant was charged in the criminal case with four counts of maintaining a drug-involved premises, in violation of 21 U.S.C. § 856(a)(1) and 18 U.S.C. § 2 (Counts One through Four) and conspiracy to distribute oxycodone in violation of 21 U.S.C. § 846 (Count Five).[1] See id. (Docket No. 14.) On May 4, 2022, the Government provided Defendant with a September 7, 2017 recording, in which FBI Special Agent Chuan Ngo told another agent the following about Defendant's civil contempt arrest:

> [Confidential informant Source 00084328] is the one who gave us, uh, Nik, you know, Nik being arrested for the civil contempt. That's when he threatened all the. You know that. Without him [the confidential informant], we wouldn't have

[1] Defendant pled guilty to Count Five of Superseding Indictment No. 18-101 on January 6, 2023. See United States v. Nikparvar-Fard, Crim. A. No. 18-101-1 (Docket No. 535). During Defendant's December 18-20, 2023 sentencing on that Count, the Government moved to dismiss Counts One through Four. See id. (Docket Nos. 669, 677, 678). The Court granted that Motion and sentenced Defendant to 107 months of imprisonment and three years of supervised release as to Count Five. Id. (Docket No. 669.)

> been able to, you know, chase that down and kept [sic] him in custody. Because right away, we charged him with threatening the officers and the false statement.

(Am. § 2255 Mot. at 15-16 of 17; Gov't Answer at 8-9 of 14.) Defendant maintains that this statement is exculpatory and could have been used to impeach the Deputies who testified against him at the trial of this matter.

## II. LEGAL STANDARD

Defendant has moved for relief pursuant to 28 U.S.C. § 2255, which provides as follows:

> A prisoner in custody under sentence of a court established by Act of Congress claiming the right to be released upon the ground that the sentence was imposed in violation of the Constitution or laws of the United States, or that the court was without jurisdiction to impose such sentence, or that the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack, may move the court which imposed the sentence to vacate, set aside or correct the sentence.

28 U.S.C. § 2255(a). "'Section 2255 does not provide habeas petitioners with a panacea for all alleged trial or sentencing errors.'" United States v. Perkins, Crim. A. No. 03-303, Civ. A. No. 07-3371, 2008 WL 399336, at *1 (E.D. Pa. Feb. 14, 2008) (quoting United States v. Rishell, Crim. A. No. 97-294-1, Civ. A. No. 01-486, 2002 WL 4638, at *1 (E.D. Pa. Dec. 21, 2001)). In order to prevail on a § 2255 motion, the movant's claimed errors of law must be constitutional, jurisdictional, "a fundamental defect which inherently results in a complete miscarriage of justice," or "an omission inconsistent with the rudimentary demands of fair procedure." Hill v. United States, 368 U.S. 424, 428 (1962); see also United States v. Travillion, 759 F.3d 281, 288 (3d Cir. 2014) (stating that "relief under § 2255 is available only when 'the claimed error of law was a fundamental defect which inherently results in a complete miscarriage of justice, and . . . present[s] exceptional circumstances where the need for the remedy afforded by the writ . . . is apparent.'" (alterations in original) (quoting Davis v. United States, 417 U.S. 333, 346 (1974))).

**III. DISCUSSION**

Defendant argues that his conviction in this case should be vacated because FBI Special Agent Chuan Ngo's statement is both impeaching and exculpatory and the Government's failure to provide this statement to him before his trial in this case violated Brady. "In Brady v. Maryland, 373 U.S. 83 (1963), [the Supreme] Court held that the government violates the Constitution's Due Process Clause 'if it withholds evidence that is favorable to the defense and *material* to the defendant's guilt or punishment.'" Turner v. United States, 582 U.S. 313, 315 (2017) (quoting Smith v. Cain, 565 U.S. 73, 75 (2012)). "To prove a Brady violation, a defendant must show the evidence at issue meets three critical elements. First, the evidence 'must be favorable to the accused, either because it is exculpatory, or because it is impeaching.'" Dennis v. Sec'y, Pa. Dep't of Corr., 834 F.3d 263, 284 (3d Cir. 2016) (quoting Strickler v. Greene, 527 U.S. 263, 281-82 (1999)) (citing United States v. Bagley, 473 U.S. 667, 676 (1985)). "Second, it 'must have been suppressed by the State, either willfully or inadvertently.'" Id. at 284-85 (quoting Strickler, 527 U.S. at 282). "Third, the evidence must have been material such that prejudice resulted from its suppression." Id. at 285 (citing Strickler, 527 U.S. at 282; Banks v. Dretke, 540 U.S. 668, 691 (2004)). "The 'touchstone of materiality is a "reasonable probability" of a different result.'" Id. (quoting Kyles v. Whitley, 514 U.S. 419, 434 (1995)). "Prosecutors have an affirmative duty 'to disclose [Brady] evidence.'" Id. at 284 (alteration in original) (quoting Strickler, 527 U.S. at 280).

Defendant contends that Agent Ngo's statement is relevant to whether he intended his statement to Deputy Marshal Jarkowsky as a threat or knew that his statement would be perceived as a threat. Essentially, he argues that Agent Ngo's statement indicates that there was an effort to have him arrested and kept incarcerated, that an individual subjected to such an effort

would reasonably believe that an "agency" planned and orchestrated his arrest in front of his patients, and that the Deputies deliberately bullied and intimidated him as part of this effort. (Def's Answer to Gov't's Opp. at 5 of 12.)

Defendant contends that Agent Ngo's statement is exculpatory because it demonstrates that a jury could have found that he made his statement as retaliation for being bullied rather than as a threat in retaliation for Deputy Marshal Jarkowsky's performance of his official duties. Defendant contends that Deputy Marshal Jarkowsky and the other Deputies bullied him by taking him out of his medical office by the front door in front of his patients and by speaking to him on the car ride to the courthouse. Thus, he contends that the Deputies bullied him by the manner in which they were performing their official duties. However, Defendant cites to no authority for the proposition retaliation against a federal law enforcement officer because of the manner in which the officer performed his official duties is different from retaliating against a federal law enforcement officer for the performance of his official duties. Consequently, we conclude that Agent Ngo's statement cannot possibly be interpreted to be exculpatory of Count One of Superseding Indictment No. 17-513, which charged Defendant with "threaten[ing] to assault and murder a federal law enforcement officer," namely Deputy Marshal Jarkowsky, while the officer "was engaged in the performance of his official duties and with intent to retaliate against [Deputy Marshal Jarkowsky] on account of the performance of his official duties," in violation of 18 U.S.C. § 115(a)(1)(B).[2] (See Docket No. 20 at 1.)

[2] Defendant also appears to contend that a jury could have found that Agent Ngo's statement could be understood to indicate that Agent Ngo and the confidential informant "arranged [Defendant's] arrest to happen at certain time, or certain location, or asked arresting agent to conduct arrest in front of defendant's patient . . ." and, if the jury believed that Agent Ngo and the confidential informant were working together in this manner, the jury could also have found that the Deputies were not engaged in the performance of their official duties when they arrested him. (Def's Answer to Gov't's Opp. at 6 of 12.) However, this convoluted

Defendant also argues that Agent Ngo's statement could have been used to impeach Deputy Agent Jarkowsky's trial testimony that he thought that Defendant was saying that he wanted to kill him, that Defendant was not joking, and that Defendant seemed serious. (See 1/9/18 N.T. at 89, 99.) Defendant further contends that Agent Ngo's statement could have been used to impeach Deputy Marshals Grandison and Gabriel, who both testified at trial that Defendant denied being Mehdi Nikparvar-Fard, the individual identified on the arrest warrant. (See 1/9/18 N.T. at 150; 1/10/18 N.T. at 29.) Their testimony related to Defendant's conviction on Count Two, which charged him with "knowingly and willfully [making] materially false, fictious, and fraudulent statements . . . when he was confronted with a bench warrant" for his arrest. (See Docket No. 20 at 2.) Defendant maintains that Agent Ngo's statement could have been used to impeach the Deputies, because it shows that they believed that he was a criminal before they arrested him. However, even if that were true, Defendant does not cite to any authority that would support his contention that the Deputies' personal beliefs as to his criminality could have been used to impeach their trial testimony regarding these issues. We therefore conclude that Agent Ngo's statement is not favorable to Defendant because it is not exculpatory or impeaching. See Dennis, 834 F.3d at 284. Accordingly, we deny the instant Motion to the extent that Defendant asks us to vacate his conviction and sentence as to both Counts of Indictment No. 17-513.

## IV. CONCLUSION

For the reasons stated above, we deny Defendant's Amended Motion to Vacate, Set Aside, or Correct Sentence pursuant to 28 U.S.C. § 2255 in its entirety. Title 28, United States

---

speculation does not satisfy Defendant's burden of showing that Agent Ngo's statement is exculpatory.

Code § 2253 provides that a defendant may not appeal an order denying a § 2255 Motion unless a certificate of appealability has been issued. 28 U.S.C. § 2253(c)(1)(B). Section 2253 further provides that "[a] certificate of appealability may issue . . . only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). Thus, a defendant must show "'that reasonable jurists could debate whether . . . the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further.'" Mathias v. Superintendent Frackville SCI, 876 F.3d 462, 474 (3d Cir. 2017) (alteration in original) (quoting Slack v. McDaniel, 529 U.S. 473, 484 (2000)). We conclude that Defendant "has not made the required substantial showing of the denial of a constitutional right such as would warrant the issuance of a Certificate of Appealability." United States v. Hicks, Crim. A. No. 07-83, 2022 WL 16637983, at *6 (E.D. Pa. Nov. 2, 2022) (citing Slack, 529 U.S. at 478; Bracey v. Superintendent. Rockview SCI, 986 F.3d 274, 283 (3d Cir. 2021)).[3] Accordingly, we decline to issue a certificate of appealability.

BY THE COURT:

/s/ John R. Padova

John R. Padova, J.

[3] On April 20, 2023, Defendant filed a Motion for Appointment of Counsel to assist him with this Motion to Vacate, Set Aside, or Correct Sentence pursuant to 28 U.S.C. § 2255. (See Docket No. 171.) We denied that Motion without prejudice. (See Docket No. 175.) Defendant reasserted his request for counsel in his Answer to the Government's Opposition brief. Title 18, United States Code, § 3006A(a)(2)(B) authorizes the appointment of counsel for an individual seeking relief under 28 U.S.C. § 2255 only under circumstances in which "the court determines that the interests of justice . . . require" the appointment of counsel. 18 U.S.C. § 3006A(a)(2)(B). Having considered Defendant's Amended Motion to Vacate, Set Aside, or Correct Sentence and all documents filed in connection therewith, we cannot conclude that appointment of counsel would be in the interests of justice. Accordingly, we deny Defendant's request that we appoint counsel to assist him with the instant Amended Motion to Vacate, Set Aside, or Correct Sentence.